**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LEILONI BLAKE SMITH,

    Defendant - Appellant.

No. 24-7081
(D.C. No. 6:22-CR-00037-RAW-2)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **KELLY**, and **MORITZ**, Circuit Judges.
_____

In March 2024, a jury found Defendant-Appellant Leiloni Blake Smith guilty of multiple counts related to the sexual abuse and exploitation of her minor children. I R. 232–33; III R. 721–23.  On appeal, Ms. Smith contends that the district court erred when it allowed testimony as to (1) the contents of a police report and (2) her demeanor in videos not yet admitted into evidence.  Aplt. Br. at 17–18.  In addition, Ms. Smith challenges certain remarks made by the prosecutor during closing argument.  Id. at 18–19.  She also contends that, even if none of these errors

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

individually warrant reversal, their cumulative effect does.  Id. at 19.  Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm.

## Background

The parties are familiar with the facts, so we need not restate them at length

here.  Suffice it to say that, on November 21 and November 24, 2021, Ms. Smith and

her romantic partner, Gregory Neil Bias,[1] sexually abused her two minor children and

made several video recordings of that abuse.  I R. 26–38; II R. 50–53.  In February

2022, a grand jury indicted Ms. Smith on fourteen counts and Mr. Bias on several

more.[2]  I R. 26–38.  While Mr. Bias pled guilty, III R. 884–85, Ms. Smith proceeded

to trial, which lasted two days, I R. 122–25.  The government called ten witnesses

and presented extensive inculpatory evidence, including nine videos that were

---

[1] The exact nature of their relationship at the time is unclear; Ms. Smith refers to Mr. Bias as her "romantic partner," while the government calls him her fiancée. Aplt. Br. at 22; Aplee. Br. at 2; II R. 51.

[2] The government charged Ms. Smith with the following: aggravated sexual abuse in Indian Country, 18 U.S.C. §§ 2241(c), 2246(2)(A), 2, 1151 & 1153 (Counts One, Three, Four, Eight, and Nine); aggravated sexual abuse in Indian Country, 18 U.S.C. §§ 2241(c), 2246(2)(B), 2, 1151 & 1153 (Counts Two, Five, and Six); aggravated sexual abuse in Indian Country, 18 U.S.C. §§ 2241(c), 2246(2)(C), 2, 1151 & 1153 (Count Seven); sexual exploitation of a child by a parent, 18 U.S.C. §§ 2251(b), 2251(e), & 2 (Counts Ten and Eleven); sexual exploitation of a child, 18 U.S.C. §§ 2251(a), 2251(e), & 2 (Counts Twelve and Thirteen); and possession of certain material involving the sexual exploitation of a minor, 18 U.S.C. § 2252(a)(4)(B) & (b)(2) (Count Fifteen).  I R. 26–33.  Mr. Bias was also charged with several counts of possession, distribution, and receipt of material involving the sexual exploitation of a minor, and of being a felon in possession of a firearm.  I R. 32–35.

admitted into evidence and published to the jury, eight of which depict the abuse. Id.; III R. 180–201, 596–606. Ms. Smith filmed the videos herself on her phone or Mr. Bias's phone. III R. 200–01. In the videos, she physically facilitates Mr. Bias's abuse or engages in abuse herself. Id. 180–201, 596–606.

Ms. Smith did not contest that she engaged in the abuse. Rather, she argued that she acted under duress due to serious threats against her life and that of her children by Mr. Bias. Aplt. Br. at 14–15; III R. 118, 702, 705–06. The defense called no witnesses. I R. 124. After deliberating for about one and a half hours, the jury returned its verdict, finding Ms. Smith guilty on thirteen of the fourteen charged counts.[3] Id. at 125; III R. 721–22. The district court sentenced her to thirty years of imprisonment with supervised release for life.[4] I R. 234–35. Other pertinent facts appear as we address her specific contentions on appeal.

## Discussion

We generally review a district court's evidentiary decisions for abuse of discretion. United States v. Paycer, 154 F.4th 1261, 1271 (10th Cir. 2025). Thus, we normally will reverse only if we have a "definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in

---

[3] The jury found Ms. Smith not guilty of Count Nine. III R. 722.

[4] The court sentenced her to thirty years on each of Counts One through Eight, 360 months on each of Counts Ten through Thirteen, and 240 months on Count Fifteen, to be served concurrently. I R. 234. It also imposed a life term of supervised release for each count to be served concurrently. Id. at 235.

the circumstances." United States v. Chavez, 976 F.3d 1178, 1193 (10th Cir. 2020) (quoting United States v. Samaniego, 187 F.3d 1222, 1223 (10th Cir. 1999)).

When the defendant objects to the admission of evidence based solely on evidentiary grounds, the nonconstitutional harmless-error standard applies. United States v. Hatley, 153 F.4th 1112, 1127 (10th Cir. 2025). An error is harmless if a party's substantial rights are not affected. Id.; Fed. R. Crim. P. 52(a); 28 U.S.C. § 2111. Thus, we must determine whether the error "had a substantial influence on the outcome or leaves [us] in grave doubt as to whether it had such effect." Chavez, 976 F.3d at 1204 (quoting United States v. Roach, 582 F.3d 1192, 1207 (10th Cir. 2009)). When engaging in harmless-error review, we consider the error in the context of the entire record. Id. The government bears the burden of proving harmlessness by a preponderance of the evidence. Hatley, 153 F.4th at 1127.

If a claim to the admission or exclusion of evidence is not preserved, we review it for plain error. Paycer, 154 F.4th at 1271. To show plain error, the defendant must establish "(1) an error (2) that is plain (3) that affected [the defendant's] substantial rights and (4) that undermined the fairness, integrity, and public reputation of the judicial proceeding." United States v. McFadden, 116 F.4th 1069, 1098 (10th Cir. 2024).

**A. Hearsay Testimony.**

Ms. Smith first contends that the district court erred by admitting, over defense counsel's objections, testimony by FBI Special Agent Kuhrt that in December 2021, Ms. Smith contacted local police over an alleged stolen vehicle. Aplt. Br. at 20–21.

4

She argues that such testimony was inadmissible hearsay because Special Agent Kuhrt learned this information from a police report and thus constituted double hearsay, and that its admission was prejudicial because it "struck at the core of her only defense: that she participated in the sexual abuse of her children only because she was under duress." Id. at 21–22. She contends that the government used the police report to argue during closing that Ms. Smith was "outraged" enough to report her vehicle as stolen, but not enough to report what Mr. Bias was allegedly forcing her to do to her children. Id. at 22–23. The government argues that the objection was not preserved, that there was no error, and that even if the objection was properly preserved and there was error, the preponderance of the evidence establishes that it was harmless to the guilty verdicts. Aplee. Br. at 24–29. The government makes a persuasive case.

But were we to assume defense counsel properly preserved the objection to the testimony below and it was inadmissible hearsay, the government has demonstrated by a preponderance of the evidence that the substantial rights of the defendant were not affected. A duress defense usually does not controvert the elements of the offenses but rather overrides them, thereby negating a conclusion of guilt. United States v. Romero, 132 F.4th 1208, 1214 (10th Cir. 2025). In other words, the conduct is excused "because [the defendant] lacked a fair opportunity to avoid acting unlawfully." Id. (citation modified).

We cannot agree that the jury's verdict was substantially swayed by the claimed error as Ms. Smith argues because the evidence against her was strong. As

noted above, the government presented extensive evidence of Ms. Smith's guilt, including videos depicting the abuse and her participation in it.  Additionally, the government called as witnesses several medical professionals who conducted sexual assault examinations of the victims and testified to the results of those examinations. III R. 609–17, 624–33, 635–49.  The government also argued that Ms. Smith had multiple opportunities besides the December 2021 phone call to seek help, including notifying neighbors, employees at her children's daycare, or the police after Mr. Bias's initial arrest in January 2022, but failed to do so.  Id. at 155–60, 296–97.  The jury considered this and other evidence, including evidence presented by Ms. Smith that she was under duress, and concluded that she failed to prove each of the elements of her duress defense — that she was under "an unlawful and present, imminent and impending threat" of death or serious bodily injury to herself or her children, that she had "no reasonable, legal alternative to violating the law," and that "a direct causal relationship could have been reasonably anticipated" between any such threat and her criminal activity — by a preponderance of the evidence.[5]  I R. 174–75.  Based on the record before us, and when viewed in the context of the entire trial, we cannot say that Special Agent Kuhrt's testimony had a substantial influence on the jury verdict or left us in grave doubt that it had such an effect.  See United States v. Denezpi, 979 F.3d 777, 784 (10th Cir. 2020) (finding putative error harmless given "overwhelming" evidence of guilt).  Therefore, the government has

---

[5] Ms. Smith does not argue on appeal any error as to these or other jury instructions.

met its burden under the harmless-error standard, and the district court did not err in admitting this testimony.

### B. Improper Lay Opinion Testimony.

Ms. Smith next takes issue with Oklahoma State Bureau of Investigation Agent Jackson's and Special Agent Kuhrt's comments about Ms. Smith's demeanor in several of the videos depicting the sexual abuse before they were admitted into evidence. Aplt. Br. at 25–26. These comments by law enforcement officers included testimony describing Ms. Smith's "tone of voice" in one video, that Ms. Smith sounded "very cutesy" and "playful" in another, that Ms. Smith was "talking" and "giggling" when the agents were asked about her "demeanor" in several videos, and that she appeared to be an "active" and "willing participant" in the videos. Id.; III R. 190, 199, 223, 226, 228, 297. Ms. Smith contends that these comments were improper lay opinions and that they were substantially more prejudicial than probative, making their admission violative of Rules 701 and 403 respectively. Aplt. Br. at 24–27. The government contends that there was no error because the agents had personally interviewed Ms. Smith and could therefore comment on her demeanor. Aplee. Br. at 31–32.

The parties also dispute whether the objections were properly preserved. Aplt. Br. at 28–29; Aplee. Br. at 29–31. Ms. Smith argues that, regardless of whether we apply the plain-error or harmless-error standard, the errors require reversal because the statements "struck at the core of [her] duress defense," Aplt. Br. at 29–31; Aplt. Reply Br. at 17–18, while the government argues that any prejudice was minimized

7

by other evidence and by the fact that each member of the jury had the opportunity to view the videos and make determinations as to Ms. Smith's demeanor for themselves, Aplee. Br. at 33–36.

We agree with the government that Ms. Smith did not properly preserve her Rule 701 or Rule 403 claims. To do so, she must have timely "state[d] the specific ground[s of the objections], unless [they were] apparent from the context[.]" Fed. R. Evid. 103(a)(1). While she need not use any "particular language" to lodge proper objections, Holguin-Hernandez v. United States, 589 U.S. 169, 174 (2020), she must "specifically and clearly apprise the district court" that the testimony at issue amounted to improper lay opinion and was substantially more prejudicial than probative, Paycer, 154 F.4th at 1271. Here, defense counsel's concerns during a sidebar about "inappropriate comments by the witness" because the videos "should speak for themselves" were not sufficiently specific to preserve either objection. III R. 166. Even assuming counsel's comment that the videos "should speak for themselves" properly indicated an objection under Rules 701 and 403, the district court stated that it would "take those [objections] as they come." Id. at 166. Because the district court did not definitively rule on these purported objections, defense counsel was required to urge them specifically to preserve the claims for appeal. Fed. R. Evid. 103(b); see United States v. Baker, 155 F.4th 1188, 1200 (10th Cir. 2025). But Ms. Smith failed to do so. She only objected later to one question to Agent Jackson about Ms. Smith's demeanor in the videos, and only based on lack of foundation and speculation, not under Rules 701 or 403. III R. 190; Aplt. Br. at 28–

8

29. It is well-settled that the specific grounds for reversal of an evidentiary ruling on appeal must be the same as those raised at trial. See, e.g., Burke v. Regalado, 935 F.3d 960, 1014 (10th Cir. 2019). Because Ms. Smith did not properly preserve these claims, we review them for plain error. Id. at 1015.

Under Rule 701, a non-expert witness may only provide opinion testimony if it is rationally based on her perception, helpful to understanding her testimony or a fact in dispute, and not based on any specialized knowledge. Fed. R. Evid. 701(a)–(c). The purpose of this rule is to prevent lay witnesses from testifying to judgments or conclusions that the jury can reach themselves. United States v. Marquez, 898 F.3d 1036, 1049 (10th Cir. 2018). Here, the agents testified to Ms. Smith's demeanor without any personal knowledge as to the events in question and before the jury had the opportunity to view the videos for themselves. Such testimony is not helpful to the jury and is precisely the sort of improper lay opinion testimony that Rule 701 aims to exclude. See United States v. Brooks, 736 F.3d 921, 930 (10th Cir. 2013).

But even assuming error, and that such error was plain, Ms. Smith cannot meet the remaining factors required to establish plain error, namely that the error affected her substantial rights. To do so, she must show "a reasonable probability that but for the error claimed, the result of the proceeding would have been different." United States v. Griffith, 65 F.4th 1216, 1218 (10th Cir. 2023) (quoting United States v. Trujillo-Terrazas, 405 F.3d 814, 818 (10th Cir. 2005)). In assessing whether such a probability exists, we consider various factors, including the strength of each party's case, whether the improperly admitted evidence affected either party's case theory,

9

the extent to which the parties emphasized the improper testimony, and whether the jury had its own opportunity to assess the defendant's demeanor.  Id.

As explained above, the government presented overwhelming evidence of Ms. Smith's guilt.  Moreover, the government did not mention, let alone emphasize, the testimony in question in its closing argument.  The videos were later admitted and published, meaning that the jury was still able to reach its own conclusions about Ms. Smith's demeanor.  And the court instructed the jury before deliberations began not to afford law enforcement witnesses any greater or lesser weight and to evaluate their credibility as they would any other witness.  I R. 154; III R. 680; see Griffith, 65 F.4th at 1223 (finding similar jury instructions militated against the prejudicial effect of improper opinion testimony).  Therefore, she cannot show that the improper testimony had any effect on her substantial rights and has not met her burden of proving plain error.  See Griffith, 65 F.4th at 1220–23 (finding no prejudice where the prosecutor did not mention the improper testimony during closing argument and the jury had the opportunity to assess witness demeanor for itself); see also United States v. Woodall, 23 F. App'x 765, 766 (9th Cir. 2001) (similarly finding no prejudice where the defendant claimed duress and a government witness testified the defendant was "not panic stricken" in a recorded phone call because (1) the government did not emphasize the testimony in its closing argument and (2) "the government introduced ample corroborating evidence" rebutting the claim of duress (citation modified)).  And even assuming Ms. Smith can show that there was error and that such error was plain as to her Rule 403 claim, the claim fails for the same

10

reason — because she cannot show prejudice.  Accordingly, we reject this contention.

### C.  Prosecutorial Misconduct.

Next, Ms. Smith contends that the government committed prosecutorial misconduct during closing argument because the prosecutor expressed her personal opinion about the strength of Ms. Smith's duress defense and because the prosecutor stated facts that were not in evidence that prejudiced that defense.  Aplt. Br. at 18–19.  When assessing prosecutorial misconduct claims under plain-error review, we will reverse only if "(1) the prosecutor's statement is plainly improper and (2) the defendant demonstrates that the improper statement affected his or her substantial rights."  United States v. Christy, 916 F.3d 814, 826–27 (10th Cir. 2019) (citation modified).  Because Ms. Smith did not object to these comments at trial, Aplt. Br. at 19, we review them for plain error, Christy, 916 F.3d at 826.

Ms. Smith first takes issue with the following comment, contending that it amounted to an "unambiguous[]" declaration of the government's opinion of Ms. Smith's duress defense: "Oh, was she under duress for those 20 minutes before the first and second video was made?  We think not, and we think common sense would lead you to conclude the same."  Aplt. Br. at 33; III R. 712 (emphasis added).  A prosecutor may not express a personal opinion about the defendant's guilt or innocence.  United States v. Young, 470 U.S. 1, 18–19 (1985).  But the mere use of personal pronouns during closing is not per se improper.  United States v. Jones, 468 F.3d 704, 708 (10th Cir. 2006).  And statements that "are merely 'mannerism[s]' . . .

11

are improper but not actionable." Id.  Here, the prosecutor made the alleged improper comment in response to a rhetorical question she asked herself.  III R. 712. Given the context of her statement, we find that that her use of "we" was nothing more than a "mannerism" that "does not cross the line" and therefore was not plainly improper.  Jones, 468 F.3d at 708.

Ms. Smith also takes issue with the following:

> Mr. Bias was a heavy methamphetamine user.  Use your common sense. Methamphetamine users binge and binge and then they crash, and when they crash, they sleep.  Sometimes they sleep for days.  What did this defendant do to alert authorities or get help or call for distress during the days that you can think about Mr. Bias's methamphetamine usage, and can consider whether he was crashed out for hours, if not days, at a time, and she did nothing because this is the life she wanted to embrace.

III. R. 714; Aplt. Br. at 33–34.  "Although a prosecutor may comment on and draw reasonable inferences from evidence presented at trial," she may not argue "prejudicial facts not in evidence."  United States v. Morrow, 79 F.4th 1169, 1184 (10th Cir. 2023) (citation modified).  While it was established at trial that Mr. Bias used methamphetamine, III R. 225–26, the government did not introduce any evidence to indicate that regular methamphetamine users pass out, or Mr. Bias passed out, for hours or days at a time, making such an inference unreasonable.

But even assuming Ms. Smith has shown that these statements were plainly improper, she fails to show that they affected her substantial rights.  When assessing prejudice, we "must weigh any improper comments against the strength of the evidence against the defendant[,]" Christy, 916 F.3d at 824, and "consider the trial as a whole, including . . . the extent of the misconduct[] and the role of the misconduct

12

within the case[,]" id. at 826 (quoting United States v. Gabaldon, 91 F.3d 91, 94 (10th Cir. 1996)).  Again, the government presented overwhelming evidence of Ms. Smith's guilt, minimizing the impact of these comments.  Thus, when viewing the trial as a whole, we find that Ms. Smith has not shown plain error.

**D. Cumulative Error.**

Finally, Ms. Smith argues that, even if none of the errors individually warrant reversal, "their cumulative impact requires a new trial[]" because they "bore directly on [Ms.] Smith's only defense—that she acted under duress."  Aplt. Br. at 36–37.

We reverse based on cumulative error only if the cumulative effect of the identified errors made the trial "so fundamentally unfair as to deny [the defendant] due process."  United States v. Coulter, 57 F.4th 1168, 1193 (10th Cir. 2023) (quoting Christy, 916 F.3d at 840).  When the defendant raises both preserved and unpreserved errors on appeal, we first consider whether any preserved errors are cumulatively harmless.  United States v. Kepler, 74 F.4th 1292, 1320 (10th Cir. 2023).  Where, as here, there is only one putative harmless error, "there can be no cumulative harm."  United States v. Anaya, 727 F.3d 1043, 1061 (10th Cir. 2013).  If the preserved errors are cumulatively harmless, we then consider them together with unpreserved errors and whether they are "sufficient to overcome the hurdles necessary to establish plain error."  Kepler, 74 F.4th at 1320 (quoting United States v. Caraway, 534 F.3d 1290, 1302 (10th Cir. 2008)).  In other words, we consider whether the putative preserved and unpreserved errors together affected Ms. Smith's substantial rights.  Anaya, 727 F.3d at 1061.  "[B]ecause the evidence of [Ms.

13

Smith's] guilt was overwhelming[,]" even the aggregation of these alleged errors "did not affect [her] substantial rights[.]" Id. Therefore, we find no cumulative error.

### E. The Dissent.

The dissent begins with an analysis of the putative errors, concluding that they were plainly erroneous, along with suggesting that we are "gloss[ing] over" the errors and "sweep[ing] their cumulative impact under the rug." Dissent at 1–6. But even assuming plain error, Ms. Smith must still show that she was prejudiced, which, as we have concluded based on our required review of the entire trial, she cannot do.

The dissent then takes issue with our prejudice analysis. Id. at 6–16. According to the dissent, "the government prevented the jury from convicting [Ms.] Smith based on relevant evidence by exaggerating the importance of [her] opportunities to seek help after the abuse occurred . . . and feeding the jury law-enforcement interpretations of [her] on-video demeanor." Id. at 15–16. The premise of the dissent thus seems to be that the outcome of the trial turned on these putative errors. But that is not the case.

Whether we engage in harmless- or plain-error review, we must consider the significance of the putative errors in the context of the entire trial. Chavez, 976 F.3d at 1204 (harmless error); see Griffith, 65 F.4th at 1218 (plain error). These doctrines recognize that "the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence" and focus on the entire trial rather than only the claimed errors. See Arizona v. Fulminante, 499 U.S. 279, 307–08 (1991)

14

(citation modified) (discussing harmless constitutional error). Again, the government presented extensive evidence rebutting Ms. Smith's claim of duress. Notably, it introduced multiple videos filmed by Ms. Smith in which she participated in or facilitated the abuse — videos that the jury saw for itself and from which it could draw its own conclusion as to Ms. Smith's claim.

The dissent also seems to downplay the fact that Ms. Smith had the opportunity to present her case to the jury. Ms. Smith called no witnesses of her own, instead relying primarily on cross-examinations of the government's witnesses and eliciting testimony to prove her claim of duress. E.g., III R. 205–26 (Agent Jackson); 282–93 (Special Agent Kuhrt).

The jury weighed the evidence presented by Ms. Smith against the evidence presented by the government to determine whether she had met her burden of proving each element of her duress defense by a preponderance of the evidence — that she was under "an unlawful and present, imminent and impending threat" of death or serious bodily injury to herself or her children, that she had "no reasonable, legal alternative to violating the law," and that "a direct causal relationship could have been reasonably anticipated" between any such threat and her criminal activity over the two days during which the abuse took place. I R. 174–75 (emphasis added). It

15

concluded that she did not.  Based on the foregoing, and contrary to the dissent's arguments, we see no reason to disturb that conclusion.

      **AFFIRMED**.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge

**24-7081,** *United States v. Smith*

**MORITZ**, Circuit Judge, dissenting.

The Constitution does not guarantee a perfect trial, but it does guarantee a fair one. *United States v. Mitcheltree*, 940 F.2d 1329, 1334 (10th Cir. 1991). Significant evidentiary errors and blatant prosecutorial misconduct during Leiloni Smith's trial deprived her of that guarantee by undermining her evidence on the only issue at trial: whether she acted under duress on November 21 and 24, 2021. Hearsay testimony about Smith's December 2021 police report impugned her claim that she had no reasonable alternative to violating the law. Demeanor testimony from law-enforcement witnesses told the jury to view Smith as a willing participant in the abuse videos, which were the most direct evidence the jury had from which to judge duress. And the prosecutor's concocted facts about meth users encouraged the jury to wonder why Smith never sought help when Gregory Bias was, supposedly, crashed out for days following meth binges. The majority glosses over these issues, choosing instead to affirm Smith's convictions based on evidence that was largely immaterial to duress. In my view, the gravity of each individual error cumulated to render Smith's trial fundamentally unfair, requiring reversal. For these reasons, I respectfully dissent.

## I.     The Plain Errors

To begin, the government ushered the district court into allowing three plain errors at trial—ones "so clear or obvious that [they] could not be subject to any reasonable dispute." *United States v. Paycer*, 154 F.4th 1261, 1272 (10th Cir. 2025)

(quoting *United States v. Lopez*, 131 F.4th 1114, 1122 (10th Cir. 2025)). The majority simply assumes all three errors for the sake of argument. Although I understand that this court can, and often does, assume error, to do so in this case does a disservice to Smith by downplaying the government's significant and sustained effort to improperly sway the jury's opinion as to duress. And failing to detail the nature of each error further allows the majority to sweep their cumulative impact under the rug. Accordingly, I consider each of these significant errors in turn before addressing the harm they caused.

A.     **Hearsay**

First, the government elicited inadmissible hearsay testimony from Agent Hannah Kuhrt that Smith called police to her home in December 2021 to report a stolen vehicle. Kuhrt's testimony was based entirely on the contents of a police report she didn't author, and it relayed the responding officer's out-of-court report that Smith called police to her home. The government offered the officer's statement for its truth. Thus, the statement was hearsay. *See* Fed. R. Evid. 801(c). And contrary to the government's argument, the statement was not admissible as the responding officer's present sense impression: "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). To be sure, "we generally credit the proposition that statements about an event and made *soon after* perceiving that event are especially trustworthy," but there was no testimony here about when the officer authored the report relative to when Smith called police. *United States v. Lovato*, 950 F.3d 1337, 1341 (10th Cir.

2

2020) (quoting *Navarette v. California*, 572 U.S. 393, 399–400 (2014)). Thus, the record contains no evidence that the responding officer made the report while or immediately after responding to Smith's call. *See id.* at 1344–47 (affirming admission of 911 call as present sense impression based in part on finding caller's description of event came "three or four minutes" after observation).

The government's alternative argument—that the statement was admissible under the residual exception—is equally unavailing. That exception permits admission of statements that do "not otherwise fall[] within a recognized hearsay exception" but "might nevertheless be sufficiently reliable." *Idaho v. Wright*, 497 U.S. 805, 817 (1990). A statement is admissible under the residual exception if (1) it "is supported by sufficient guarantees of trustworthiness," (2) "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," and (3) "the proponent gives [the] adverse party reasonable notice of the intent to offer the statement." Fed. R. Evid. 807(a), (b). Although the government argues that the report bears sufficient guarantees of trustworthiness, it tellingly fails to address the other requirements of Rule 807.[1] Thus, the government fails to prove that this is an "extraordinary circumstance[]" warranting application of the residual exception. *United States v. McFadden*, 116 F.4th 1069, 1081 (10th Cir. 2024) (quoting *United States v. Burgess*, 99 F.4th 1175, 1183 (10th Cir. 2024)). Admitting the police-report testimony—which, again, the

---

[1] Indeed, as I discuss later, the government takes the position elsewhere that this testimony was, in fact, irrelevant. *See infra* Section II.B.

government offered to undermine Smith's claim of no reasonable alternatives—was plainly erroneous.[2]

### B.    Improper Lay Opinion Testimony

Second, and perhaps most troubling, the government elicited inadmissible lay opinion testimony from Kuhrt and Agent Melissa Jackson regarding Smith's demeanor in the abuse videos. When the government asked Kuhrt whether Smith looked and sounded like an unwilling participant in the videos, she answered, "No." R. vol. 3, 297. When the government asked Jackson whether Smith appeared distressed in one of the videos, she answered, "No," and stated that Smith seemed like "an active participant and a willing participant." *Id.* at 190. Notably, this testimony took place before the jury had even seen the abuse videos.

The majority recognizes that Federal Rule of Evidence 701 requires lay opinion testimony to be "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701(b). The majority also acknowledges the purpose of Rule 701: "to exclude testimony where the witness is no better suited than the jury to make the judgment at issue, providing assurance against the admission of opinions that merely tell the jury what result to reach." *United States v. Marquez*, 898 F.3d 1036, 1049 (10th Cir. 2018) (cleaned up) (quoting *United States v. Brooks*, 736 F.3d 921, 931 n.2 (10th Cir. 2013)). And the majority concedes that

---

[2] As a reminder, the report was not admissible as a public record because this is a criminal case and the report sets out "a matter observed by law-enforcement personnel." Fed. R. Evid. 803(8)(A)(ii).

the agents' testimony was "not helpful to the jury and is precisely the sort of improper lay opinion testimony that Rule 701 aims to exclude." Maj. Op. at 9. Yet the majority inexplicably declines to find that admitting the testimony was plain error. It was—exactly for the reasons the majority states.[3]

## C.    Prosecutorial Misconduct

Third, in a further attempt to undermine Smith's duress defense, the government made up facts in its closing argument. Taking off from defense counsel's closing statements about Bias's undisputed methamphetamine use, the prosecutor unaccountably told the jury that "[m]ethamphetamine users binge and binge and then they crash, and when they crash, they sleep. Sometimes they sleep for days." R. vol. 3, 714. The prosecutor then implored the jury to consider why Smith did not seek help during the hours, "if not days," that Bias might have been "crashed out." *Id.* The majority accepts that the prosecutor's concocted facts were improper under our precedent, but again, inexplicably, it stops short of finding plain error. Let's be clear:

---

[3] The government's citations to the contrary are not persuasive. In *Ives v. Boone*, counsel asked the witness to opine on a victim's mental state during a conversation with the victim, and the witness had "spent several hours with the victim and had ample opportunity to observe her demeanor." 101 F. App'x 274, 286 (10th Cir. 2004). In *United States v. Chiquito*, the witness testified that she saw no signs a victim was lying in any of the 12 counseling sessions she had with the victim. 106 F.3d 311, 314–15 (10th Cir. 1997). In both cases, the witnesses could opine about the victims' mental state or credibility based on interactions with the victims that the jury could not observe and were thus better positioned than the jury to form opinions about the victims. Here, though, the agents' testimony about Smith's demeanor was based solely on videos introduced at trial. And the agents offered no reason to believe that their assessments of Smith's demeanor were any more informed than the jury's. In other words, the agents were not better positioned than the jury to form opinions about Smith's demeanor.

there was absolutely no evidence in the record to support the government's assertion that meth users binge, crash, and then sleep for days at a time. And we have long recognized that a prosecutor's closing arguments cannot reference matters "outside the record [or] ma[ke] statements as to facts not proven." *United States v. Latimer*, 511 F.2d 498, 502–03 (10th Cir. 1975).

The government bafflingly defends the prosecutor's misstatement, suggesting the comment was a reasonable inference from the evidence because "[m]ethamphetamine users . . . sleep[;] in fact[,] everyone does." Aplee. Br. 42. No. That "everyone sleeps" does not make it remotely reasonable to infer that Bias's meth use caused him to sleep for days at a time. Unlike the majority, I would call this what it is—bunk—and recognize that permitting the prosecutor to invent her own facts was plainly erroneous.

## II.    Effect on Substantial Rights

With this understanding of each error's obviousness and intended effect, I turn to prong three: the errors' effect on Smith's substantial rights. To show such an effect, an appellant "generally must demonstrate that [the combined] error[s were] 'prejudicial, meaning that there is a reasonable probability that, but for the error[s] claimed, the result of the proceeding would have been different.'" *United States v. Starks*, 34 F.4th 1142, 1157 (10th Cir. 2022) (quoting *United States v. Bustamante-Conchas*, 850 F.3d 1130, 1138 (10th Cir. 2017)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (cleaned up) (quoting *United States v. Hasan*, 526 F.3d 653, 665 (10th Cir. 2008)).

### A.    Substantial Impact on Smith's Only Defense

Crucially, all three errors undermined the only defense Smith raised at trial—that she acted under duress when participating in the abuse. As the jury instructions stated, succeeding on that defense turned on Smith's proving, by a preponderance of the evidence, three things: (1) that she "was under an unlawful and present, imminent[,] and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury to herself or a family member"; (2) that she "had no reasonable, legal alternative to violating the law," meaning she had no chance both to refuse to do the criminal act and also to avoid the threatened harm"; and (3) that "a direct causal relationship could have been reasonably anticipated between engaging in the criminal action and avoiding the threatened harm." R. vol. 1, 174–75; *see also United States v. Dixon*, 901 F.3d 1170, 1176 (10th Cir. 2018) (outlining elements of duress defense).

Smith marshaled evidence as to each element. Kuhrt testified that Smith reported participating in the abuse because she was afraid of Bias: he hadn't just threatened her, he'd threatened to break her children's fingers. Agent Matthew Wagner told a similar story. He testified that, according to Smith, Bias abused her and threatened her children, kept guns in the house and had pointed them at her, and threatened to use a knife on her "if she did not comply with his wishes." R. vol. 3, 251.

But the jury's assessment of Smith's duress defense was tainted by each of the plain errors. Take Kuhrt's testimony that Smith called police to report a stolen

7

vehicle. The government suggested that if Smith was comfortable contacting law enforcement at that point, she should've been able to call police to intervene in the abuse. Thus, the government used the inadmissible hearsay to cast doubt on Smith's claim that she had no reasonable alternative to violating the law.

Then, the prosecutor used manufactured facts about meth users to drive home the same point: Smith could've sought help when Bias was, as the prosecutor speculated, in a meth-induced "crash" for "days[] at a time." R. vol. 3, 714. And although the district court instructed the jury not to base its decision on statements made by counsel in argument, the prosecutor contradicted that instruction by explicitly advising the jury that it *could* consider facts not in evidence, stating, "What did this defendant do to alert authorities or get help or call for distress during the days that *you can think about* . . . Bias's methamphetamine usage, *and can consider* whether he was crashed out for hours, if not days, at a time." *Id.* (emphases added). Simply put, this prosecutor made up facts not in evidence—that Bias crashed out for days—and then told the jury that it could consider these concocted facts. Yet the district court issued no curative instructions following the government's statements, which, at best, left the jury confused about what it could consider and, at worst, impressed upon the jury that it could consider facts not in evidence.

Equally—if not more—prejudicial was the agents' description of Smith's demeanor in videos of the abuse, which the jury heard *before* it watched the videos. The agents testified that Smith *did not* look and sound like an *unwilling* participant in the videos and that Smith *did* look like an *active and willing* participant in one of the

videos. In other words, the agents told the jury what conclusions to reach about Smith on the videos—evidence directly relevant to duress.

The government weakly responds that this testimony did not affect Smith's substantial rights because the jury could have viewed the videos and "easily rejected [the law-enforcement agents'] interpretation should they have chosen to do so." Aplee. Br. 36. Further, the government broadly opines that the "limited" remarks "made by . . . Jackson and . . . Kuhrt did not have a substantial influence on the outcome of the case." *Id.*

But the government cites no support for its suggestion that the jury could have "easily" rejected the agents' opinion testimony. *Id.* Maybe that's because this proposition actually *contradicts* what courts have generally recognized—that "juries may place *greater* weight on evidence perceived to have the imprimatur of the government." *Brooks*, 736 F.3d at 931 (quoting *United States v. Casas*, 356 F.3d 104, 119–20 (1st Cir. 2004)); *accord United States v. McGill*, 815 F.3d 846, 878 (D.C. Cir. 2016); *see also United States v. Orenuga*, 430 F.3d 1158, 1163 (D.C. Cir. 2005) (noting "[t]he potential for jurors to attach undue weight to the testimony of law[-]enforcement officials"). And although the government is arguably correct to characterize the *scope* of the agents' opinion testimony as "limited," it inexplicably overlooks that its *significance* was hardly "limited." Aplee. Br. 36. *Both* agents improperly offered their opinion as to the *only* issue the jury was asked to decide— whether Smith acted under duress at the time of the abuse. And they did so before the jury even had a chance to view the videos, which heightened the effect of the error.

9

*See United States v. Griffin*, 324 F.3d 330, 349 (5th Cir. 2003) (noting that allowing government witnesses to summarize anticipated evidence "would greatly increase the danger that a jury 'might rely upon the alleged facts . . . as if those facts had already been proved'" (cleaned up) (quoting *United States v. Scales*, 594 F.2d 558, 564 (6th Cir. 1979))). Under these circumstances, I have no hesitation in concluding that the improper demeanor testimony likely influenced the jury's deliberations.

What's more, the government chose to double down on these errors in closing argument. The prosecutor reiterated the demeanor testimony's primary theme— "[Smith] did nothing to stop the abuse because she was a willing participant," R. vol. 3, 700—without identifying a basis for that conclusion. She admonished Smith for calling police to report a stolen vehicle but not to report Bias's abuse. And, of course, she gave the jury invented facts about meth users sleeping for days at a time and urged the jury to consider whether Smith could have sought help when Bias was sleeping off a meth binge. Emphasizing these errors in closing arguments increased the likelihood they impacted the jury's decision. *See United States v. Griffith*, 65 F.4th 1216, 1220 (10th Cir. 2023). So under these circumstances, there is a reasonable probability that, but for the errors, the result of the proceeding would have been different.

## B.    The Majority's Flawed Analysis

Resisting this conclusion, the majority finds that the evidence against Smith was too strong for the errors to affect her substantial rights. For this proposition, the

majority primarily relies on Smith's opportunities to seek help in December 2021 and January 2022, and video evidence of Smith's participation in the abuse.[4]

### 1.     Inadmissible Evidence of Smith's Opportunities to Seek Help

The government's own brief both reveals why Smith's opportunities to seek help in December 2021 and January 2022 are immaterial to her guilt and exposes how the prosecutor's contrary claims below only magnified the prejudicial effect of the hearsay and invented-facts errors. To establish duress, Smith had to be under a "present, imminent[,] and impending threat" that left her "no reasonable, legal alternative" to participating in the abuse. *Dixon*, 901 F.3d at 1176 (quoting Tenth Cir. Crim. Pattern Jury Instrs. § 1.36). Though this legal standard focuses on Smith's situation at the time of the alleged criminal conduct—here, the abuse that occurred on November 21 and 24—the government urged the jury to consider Smith's interaction with police in December 2021 and her opportunities to seek help while Bias supposedly slept for days. It further suggested to the jury that Smith wasn't under duress because she theoretically could have sought help in some other fashion, at any time after the alleged conduct, by talking to a neighbor or putting a note in her baby's diaper.

Yet now that Smith challenges her convictions on appeal, the government does an about-face, conceding that evidence about Smith's ability to seek help *after* the

---

[4] The majority also relies on testimony about sexual-assault examinations of the victims. But Smith's participation in the abuse was not at issue—only whether she did so under duress. The medical testimony simply isn't relevant to that question.

11

date of the abuse is irrelevant. Specifically, the government acknowledges that because the relevant time period for assessing duress is "*at the time* [Smith] committed the offense," "[i]t actually mattered *very little* whether . . . she came into contact with police" in December because "her contact with police, a month after the offense, offered little probative evidence of her guilt." Aplee. Br. 28 (emphases added). Similarly, the government admits that "[t]he [prosecutor's statement] about Bias'[s] methamphetamine use likewise did not speak to whether she had a reasonable legal alternative to violating the law on the day of the offense."[5] *Id.* at 47. In other words, the government now concedes that both the police-report testimony it improperly sought to admit and its baseless argument that Smith could have sought help during Bias's supposed binge-and-crash periods were irrelevant. And although the government does not expressly extend its concession to Smith's other alleged opportunities to seek help, like sticking a note in her baby's diaper, logic demands as much. The government acknowledges that it presented these other opportunities in furtherance of its argument that Smith had reasonable legal alternatives to violating the law. But because these other theoretical opportunities to seek help were

---

[5] Implausibly, the government also argues the opposite: that the prosecutor's statements about meth users sleeping for days were "directly responsive to [Smith's] argument [that] she was under duress at the time of the offense." Aplee. Br. 42. The government makes no effort to explain these contradictory arguments that go to the very heart of the issue the jury was asked to decide. But whatever the government's true position, the law dictates that the prosecutor's statements about meth users were irrelevant.

untethered to the November abuse, they equally "mattered very little" and "offered little probative evidence of her guilt."[6] *Id.*

Inexplicably, the majority ignores the government's backtracking. More than that, it puzzlingly relies on evidence the government admits was irrelevant to bolster its conclusion that Smith's substantial rights were unaffected. But Smith's opportunities to report the abuse after it happened were entirely irrelevant to duress, as the government now concedes, and thus should carry no weight in the majority's analysis.

On the contrary, considered in light of the government's concession, its introduction of and emphasis on the inadmissible police-report testimony and the made-up facts about meth users strongly supports finding an effect on Smith's substantial rights. Remember, the only purpose of this evidence was to convince the jury that Smith had reasonable, legal alternatives to participating in the abuse because she could've sought help after it happened. But if, as the government now admits, post-abuse opportunities to seek help were immaterial to duress, then the testimony and made-up facts served no other purpose than to unfairly support the government's theory at trial. Stated differently, the government's use of inadmissible and irrelevant evidence weighs heavily in Smith's favor—not the government's—on the cumulative-error scale.

---

[6] Thus, it doesn't matter that these opportunities might have been "cumulative" of other opportunities Smith had to seek help. Aplee. Br. 28. As the government correctly concedes, none of the opportunities were relevant to duress.

13

The government paradoxically suggests that the jury would have known to disregard this irrelevant evidence because of the duress instructions. This questionable advocacy defies both logic and law. And unsurprisingly, the government cites no authority to support its claim that it can assail the jury with inadmissible and irrelevant evidence, highlight that evidence in closing arguments, and then expect the jury to understand the evidence was irrelevant to the only issue it was asked to decide.[7] The government simply can't have its evidence and minimize it, too.

### 2.     Videos Tainted by Improper Lay Opinion Testimony

That just leaves the videos, which were certainly relevant to the question of duress. However, the government prevented the jury from forming its own conclusions about the videos by eliciting improper testimony about Smith's on-video demeanor from not one, but two, law-enforcement agents—before the jury viewed the videos—and reiterating the main theme from this testimony in closing argument. This error likely impacted Smith's substantial rights standing alone. But considered along with the blatantly improper and irrelevant testimony about Smith's report to police and the prosecutor's unfounded claims about meth users (both of which the

---

[7] The government cites *United States v. Pursley*, 577 F.3d 1204 (10th Cir. 2009), to suggest that the admission of evidence with minor probative value is harmless. But *Pursley* is not analogous. There, we found the admission of an exhibit harmless in part because the exhibit "offered little probative evidence" of the defendant's guilt. *Id.* at 1227. But that is clearly distinct from the government's suggestion here—that the jury would somehow have understood from the duress instructions that it was to disregard as irrelevant evidence that the government relied on heavily to disprove duress.

14

prosecutor used in closing to undermine Smith's duress defense), the effect on Smith's substantial rights is even more apparent.

## III.    The Integrity of Judicial Proceedings

The only remaining question is prong four: whether these plain errors "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Paycer*, 154 F.4th at 1271 (quoting *United States v. Frost*, 684 F.3d 963, 971 (10th Cir. 2012)). When a defendant suffers a nonconstitutional error, such as an erroneous evidentiary decision, *United States v. Cushing*, 10 F.4th 1055, 1077 (10th Cir. 2021), they must show that allowing the "error to stand would be 'particularly egregious' and would constitute a 'miscarriage of justice,'" *Morales-Fernandez v. I.N.S.*, 418 F.3d 1116, 1124 (10th Cir. 2005) (quoting *United States v. Gilkey*, 118 F.3d 702, 704 (10th Cir. 1997)). When a defendant suffers a constitutional error, such as certain kinds of prosecutorial misconduct, *Christy*, 916 F.3d at 824, "'it is ordinarily natural to conclude that the fourth prong [of plain-error review] is also satisfied and reversal is necessary.'" *United States v. Maryboy*, 138 F.4th 1274, 1295 (10th Cir. 2025) (cleaned up) (quoting *United States v. Miller*, 891 F.3d 1220, 1237 (10th Cir. 2018)).

Smith suffered both constitutional and nonconstitutional errors, all of which, as discussed above, seriously affected the fairness of her trial. It is entirely possible that the jury would have convicted Smith had it considered only Smith's actions (or inaction) at the time of the offense and been permitted to form its own conclusions about Smith's demeanor on video. But the government prevented the jury from

15

convicting Smith based on relevant evidence by exaggerating the importance of Smith's opportunities to seek help after the abuse occurred, including the imaginary scenario of Bias sleeping for days at a time, and feeding the jury law-enforcement interpretations of Smith's on-video demeanor. Allowing Smith's convictions to stand in the face of these errors is particularly egregious and effectuates a miscarriage of justice because it rewards the government's strategy of inviting plain error for the sake of securing a guilty verdict. Surely our Constitution guarantees more for criminal defendants. Thus, I would reverse Smith's convictions and remand for a new trial.